Jared S. Pettinato, DC Bar No. 496901
The Pettinato Firm
3416 13th St. NW, #1
Washington, DC 20010
Jared@JaredPettinato.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR CONSTITUTIONAL INTEGRITY, P.O. Box 43074, Washington, DC 20010, | No. 21-3045 |
| Plaintiff, | Judge Justin Walker |
| v. | Judge Carl Nichols |
| | Judge Florence Pan |
| THE CENSUS BUREAU, 4600 Silver Hill Road Washington, DC 20233; | |
| THE DEPARTMENT OF COMMERCE, 1401 Constitution Ave NW Washington, DC 20230; | |
| GINA RAIMONDO, Secretary of Commerce, in her official capacity, U.S. Department of Commerce 1401 Constitution Ave NW Washington, DC 20230; | |
| ROBERT SANTOS, Census Bureau Director, in his official capacity, 4600 Silver Hill Road Washington, DC 20233; | |
| Defendants. | |

## AMENDED COMPLAINT

# INTRODUCTION[1]

1. States are attacking citizens' rights to vote with an intensity not seen since the Civil War. Civil War problems demand Reconstruction remedies. The Framers of the Fourteenth Amendment armed future citizens with tools to thwart these forces that seek to undermine democracy.

2. When states deny or "in any way" abridge their citizens' rights to vote, Section 2 of the Fourteenth Amendment requires the United States to calculate each state's "basis of representation" and to apportion seats in the U.S. House of Representatives based on that figure, instead of the state's actually enumerated population.[2] Recent voting abridgments have triggered the Constitution's plain-language consequence. The Fourteenth Amendment and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, compel the Secretary of Commerce Gina

---

[1] Federal Rule of Civil Procedure 15(a)(1)(B) allows Citizens to file this amendment as of right.

[2]   Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis for representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. CONST., 14th amend., § 2. The Nineteenth and Twenty-Sixth Amendments, respectively, deleted "male" and replaced "twenty-one" with "eighteen." *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1149 n.7 (2016) (Alito, J., concurring); *Breedlove v. Suttles*, 302 U.S. 277, 283 (1937), *overruled on other grounds* by *Harper v. State Bd. of Elections*, 383 U.S. 663, 668-69 (1966).

Raimondo, the Department of Commerce, the Census Bureau, and Acting Census Bureau Director Ron S. Jarmin (collectively, Census) to implement that consequence.

3. For decades since the Voting Rights Act of 1965, states have expanded citizens' voting rights and access to ballots. Some have adopted vote-by-mail, absentee ballot voting for voters with excuses, early voting (opening some polling locations on days earlier than election day), and some automatically mail ballots to every registered voter.

4. In recent times, however, some states passed laws to lessen or to diminish voters' abilities to participate in the democratic process. These voter-abridging laws have revitalized the need for the Fourteenth Amendment. By its terms, the Fourteenth Amendment does not require any state to change its voting regulations. It only implements federal consequences when states deny or abridge their citizens' rights to vote.

5. The Fourteenth Amendment requires Census to identify each state's denials and abridgments, to determine the number of citizens they affect, to calculate the basis of representation for states that denied or abridged their citizens' rights to vote, and to distribute the seats in the House of Representatives among the states. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Dist. of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008). Census did not complete that process.

6. In April 2021, Secretary of Commerce Raimondo sent the President a report with the results of the 2020 census (the Report). *See* 13 U.S.C. § 141(b). There, Census violated the Fourteenth Amendment and the APA by failing to calculate those bases for representation. Its failure resulted in apportioning too many representatives to some states and too few to other states, which include New York, Pennsylvania, and Virginia. Citizens for Constitutional Integrity's (Citizens) members live in those states.

7. The APA and the Constitution compel setting aside and remanding the 2020 census report to Census to complete the requirements under the Fourteenth Amendment. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[I]f the agency has not considered all relevant factors, . . . , the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). Alternately, the Constitution and the Fourteenth Amendment require the Court to issue a writ of mandamus to complete that analysis. *See Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992).

## CAUSE OF ACTION, JURISDICTION, AND VENUE

8. United States Code Title 28, sections 1331 and 1361, assign this Court jurisdiction over this case both because the case presents a federal question and because it is "in the nature of mandamus to compel" United States officers and agencies "to perform a duty owed to" Citizens. *See Califano v. Sanders*, 430 U.S. 99, 105 (1977).

9. The United States Code also directs this Court to convene a three-judge court because this "action . . . challeng[es] the constitutionality of the apportionment of congressional districts . . . ." 28 U.S.C. § 2284(a); *see Utah v. Evans*, 182 F. Supp. 2d 1165, 1167 (D. Utah 2001), *aff'd* 536 U.S. 457; *see also Dep't of Commerce v. Montana*, 503 U.S. 442, 446 (1992). A district judge may only examine the allegations in the complaint and determine whether the complaint's allegations "satisfy[] the criteria" of Section 2284(a): "no more, no less." *Shapiro v. McManus*, 577 U.S. 39, 44 (2015) (alteration omitted). Citizens are concurrently filing an LCvR 9.1 application for a three-judge court.

10. The APA waives sovereign immunity. 5 U.S.C. § 702.

11. The statute commonly known as the Declaratory Judgment Act, Act of June 14, 1934, Pub. L. No. 73-343, 48 Stat. 955 (1934) (codified at 28 U.S.C. §§ 2201-02), grants this Court authority to issue declaratory judgment.

12. Separately, 28 U.S.C. § 1361, colloquially known as the All Writs Act, grants this Court authority to issue writs of mandamus and any other appropriate writs.

13. This District sets the proper venue for four reasons:

    a. On information and belief, Ms. Raimondo works here, *see id.* §§ 1391(b)(1),

    b. On information and belief, Census sent the Report to the President here, *see id.* § 1391(b)(2),

    c. The Defendants are either U.S. officers or agencies, *see id.* § 1391(e)(1)(A), (B), and

d. Citizens maintain their principal office within this District, and this

case involves no real property. *See id.* § 1391(e)(1)(C).

## PLAINTIFF

14. Citizens for Constitutional Integrity is a nonprofit organization that

researches and advocates for legislation, regulations, and government programs. Its

purposes include improving the United States Constitution's integrity, democratic

elections, and government accountability. It maintains its principal office in

Washington, D.C.

15. Citizens' members include citizens of New York, Pennsylvania, and Virginia.

These individuals rely on their members of Congress to advocate for their issues.

Removing representative seats has diluted their votes by leaving them to compete

with more people for their members' time and attention to their issues. Citizens'

members are therefore suffering concrete harms from losing a representative seat in

their respective states. That harm arises from Census failing to complete the

procedures the Fourteenth Amendment requires.

16. Citizens seeks to protect interests germane to its purpose, and individual

members need not participate to advance Citizens' claims or to obtain the relief

Citizens seek.

## DEFENDANTS

17. Congress assigned the Census Bureau responsibility for tabulating the

actual enumeration of persons in the United States. 13 U.S.C. § 141. It also

assigned the Census Bureau "a duty to conduct a census that is accurate and

that fairly accounts for the crucial representational rights that depend on the census and the apportionment." *Dep't of Commerce v. N.Y.*, 139 S. Ct. 2551, 2568-69 (2019) (quotations omitted) (citing 2 U.S.C. § 2a and 13 U.S.C. § 141).

18. The Department of Commerce oversees and directs its components, which include the Census Bureau.

19. Commerce Secretary Gina Raimondo, in her official capacity, oversees and directs the Department of Commerce, and she sent the President the census results and the apportionment calculations. "Congress has delegated its broad authority over the census to the Secretary [of Commerce.]" *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996).

20. Census Bureau Director Robert Santos, in his official capacity, oversees and directs the Census Bureau. His predecessor oversaw the calculations for apportioning seats among the states. Federal Rule of Civil Procedure 25(d) automatically substitutes him for the prior defendant.

## LEGAL BACKGROUND

## I. Every ten years, Census distributes representative seats according to the method of equal proportions.

21. The Constitution directs the United States to apportion "Representatives . . . among the several States according to their respective numbers, counting the whole number of persons in each State." U.S. Const. amend. XIV, sec. 2. It requires the Executive Branch to conduct an "actual Enumeration" every ten years in "such Manner as" Congress directs, as long as each state receives "at Least one Representative." U.S. Const. art. 1, sec. 2.

22. When distributing 435 Representatives among fifty states, the shifting populations never divide evenly among 435 districts. *Montana*, 503 U.S. at 452 ("the fractional remainder problem"). Therefore, every method for apportioning representatives leaves states larger or smaller remainders of population without representatives. Depending on the method for handling remainders, some states win and some states lose. *See generally id.*

23. For about 150 years, Congress switched back and forth among various apportionment methods. *Id.* at 448-51. That ad hoc system broke down after the 1920 census, when Congress failed to apportion the seats based on those census results. *Id.* at 448. To make a self-executing process going forward, Congress directed the National Academy of Science to recommend a method for solving the fractional remainder problem. *Id.* at 451, 452 n.25. Among five possible methods, each with advantages and disadvantages, mathematicians at the Academy proposed the method of equal proportions because it "minimized the discrepancy between the size of the districts in any pair of States." *Id.* at 452-54. In 1941, Congress required Census to use that method going forward. *Id.* at 451-52; Act of Nov. 15, 1941, § 1, 55 Stat. 761-762 (codified at 2 U.S.C. § 2a).

24. As part of that self-executing apportionment, Congress requires the Secretary to report to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b); *see also id.* § 195. After receiving the Secretary's

report, Congress required the President to send a statement that describes the results of the census and the distribution of Representative seats. 2 U.S.C. § 2a.

## II. The Fourteenth Amendment requires Census to calculate the basis of representation.

25. Before Census can calculate the distribution of representatives among the states, the Fourteenth Amendment requires it to calculate the basis of representation for each state that denies or abridges that state's citizens' right to vote.

26. The Framers literally wrote this equation into the Fourteenth Amendment:

$$\frac{\text{Basis of representation}}{\text{Residents}} = \frac{\begin{array}{c}\text{Citizens over eighteen years old whose rights} \\ \text{to vote the State did NOT} \\ \text{deny or abridge in any way} \\ \text{+ citizens denied because of criminal convictions} \\ \text{+ citizen denied because of rebellion particiption}\end{array}}{\text{Citizens at least eighteen years old}}$$

27. Generally, the Framers sought to discount a state's apportionment population by the percentage of its citizens who could not vote. Take 1870 North Carolina. Its citizen population split roughly into two-thirds white people and one-third black people. *See* Census Bureau, Population of the U.S., Table 1 (June 1, 1870),

http://www2.census.gov/library/publications/decennial/1870/population/1870a-04.pdf

(391,650/1,071,361 = 0.36). At that time, North Carolina did not allow black citizens to vote. *See* Report of the Joint Committee on Reconstruction (Reconstruction Report), Virginia, North Carolina, South Carolina 174, H.R. Rep. No. 30, 39th Cong., 1st Sess. (1866); Sen. Rep. No. 112, 39th Cong., 1st Sess. (1866). Then, the Fourteenth Amendment would allow Census to count only two-thirds of North

Carolina's enumerated population when distributing representative seats (assuming for simplicity that the census reflects citizens and that North Carolina did not disenfranchise anyone for criminal convictions or rebellion).

28. The Framers sought to "secure the civil rights of all citizens of the republic" and to ensure "a just equality of representation." Reconstruction Report XVIII. They saw no way to accomplish these and other goals without adding provisions to the Constitution. *Id.*

29. In particular, the Framers recognized that the Thirteenth Amendment, which outlawed slavery, perversely rewarded rebel states for the Civil War by *increasing* their number of seats in the House of Representatives. *Id.* at XIII. Before the Civil War, enslaved persons counted as *three*-fifths of a person; after the Civil War, those newly free persons counted as *five*-fifths of a person—and the Framers knew those rebel states would not let the newly freed people vote. *Id.*; *see* U.S. Const. art. 1, sec. 2 ("the whole Number of free Persons . . . and . . . three fifths of all other Persons."). The Thirteenth Amendment freed three million, six hundred thousand people in the rebel states, and that would have given the rebel states' leaders thirteen additional seats without giving any formerly enslaved person a voice in their destiny. *See* Cong. Globe, 39th Cong., 1st Sess. 74 (1866) (hereinafter CG); CG2767.

30. The Framers concluded that the rebel states had built "a spirit of oligarchy adverse to republican institutions, which finally inaugurated civil war." Reconstruction Report XIII. They rejected as not "just or proper" a situation that

freed formerly enslaved people, but confined "all the political advantages" to their former masters. *Id.*

31. No easy solution presented itself. The Framers doubted whether, even by constitutional amendment, the United States could "prescribe the qualifications of voters in a state." *Id.* But they knew the federal constitution had complete power over representation in the federal government. Therefore, they devised a "just and proper" method of allotting "political power . . . in all the States exactly in proportion as the right of suffrage should be granted . . . ." *Id.*

32. The Framers left the rights of suffrage to the state, and they promised increased political power in the House in exchange for allowing "all to participate." *Id.* They believed the great power of democracy could bring about equality of all people. They "hoped, at no distant day, to an equal participation of all, without distinction, in all the rights and privileges of citizenship, thus affording a full and adequate protection to all classes of citizens, since all would have through the ballot-box, the power of self-protection." *Id.*

33. The 1866 Framers expected that, once implemented, the Fourteenth Amendment would take away at least twenty-four seats from the rebel states if those states did not extend the right to vote to formerly enslaved people. CG2767. Unfortunately, after the 1870 census, Congress lacked sufficient reliable data to implement it. George David Zuckerman, *A Consideration of the History and Present Status of Section 2 of the Fourteenth Amend.*, 30 FORDHAM L. REV. 93, 110-15 (1961). Congress wrote a similar requirement into a statute, but that statute does not

operate quite the same way as the amendment. Act of Feb. 2, 1872 § 6, 17 Stat. 29 (codified at 2 U.S.C. § 6); *see A Consideration of the History and Present Status of Section 2 of the Fourteenth Amend.*, 30 FORDHAM L. REV. at 115. Census never implemented that statute, either.

## III. The Administrative Procedure Act

34. The APA contains "generous" and "comprehensive provisions" for judicial review, and they "allow any person 'adversely affected or aggrieved' by agency action to obtain judicial review thereof, so long as the decision challenged represents a 'final agency action for which there is no other adequate remedy in a court.'" *Webster v. Doe*, 486 U.S. 592, 599 (1988) (quoting 5 U.S.C. § 704); *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967). Congress passed the APA after "a long period of study and strife; it settles long-continued and hard-fought contentions, and enacts a formula upon which opposing social and political forces have come to rest." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 40 (1950). The Supreme Court directs courts "to give effect to [the APA's] remedial purposes where the evils it was aimed at appear." *Id.* at 41.

35. The APA provides directions both to agencies and to courts. It requires agencies to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983) (quotations omitted).

36. Separately, the APA directs courts to take a "thorough, probing, in-depth review" of agency decisions. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S.

402, 415 (1971), *overruled on other grounds* by *Califano v. Sanders*, 430 U.S. 99, 104, 107 (1977). When agencies fail at their duties, the APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions" that qualify as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

37. When agencies err, courts generally remand the action to the agency. *Fla. Power & Light.*, 470 U.S. at 744. In the meantime, "the [agency's] decision must be vacated and the matter remanded to him for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam).

## FACTUAL BACKGROUND

### I. Census possesses voluminous data to implement the Fourteenth Amendment.

38. In stark contrast to the 1870 Census, Census now possesses and controls voluminous data from which it can determine every factor in the Fourteenth Amendment equation. Census actually enumerates each state's resident population every ten years. For each state, it collects data on the number of citizens at least eighteen years old and the number of registered voters.

39. Census already possesses voluminous administrative data on citizens and residents, and it can collect other administrative data from other federal agencies. For the actual enumeration every ten years, Census obtains information from sources that include past censuses, the IRS, the Medicare enrollment database, the

Indian Health Service, the U.S. Postal Service, and the Social Security Administration.

40. Census could ask states to volunteer information. States could increase their number of seats by volunteering, for example, the number of citizens who cannot vote because of criminal convictions. States could cooperate or decline to cooperate at their peril.

41. With all of that information, Census can easily, or at least practically, determine every factor in the Fourteenth Amendment equation to calculate each state's basis of representation.

42. In April 2021, Secretary Raimondo delivered to President Joe Biden the results of Census's 2020 Census Results (the Report). Citizens filed a request under the Freedom of Information Act for that report, but Census has not produced it. Regardless, Census released the actual enumeration data on the internet. Table 1. Apportionment Population and Number of Representatives by State: 2020 Census (Apr. 26, 2021), https://www.census.gov/data/tables/2020/dec/2020-apportionment-data.html. In response to a letter from Citizens, Census admitted that it did not apply the Fourteenth Amendment or discount any state's population based on denials or abridgments of the states' citizens' rights to vote. *See generally* Letter from Ron S. Jarmin, Acting Director of the Census Bureau, to Jared Pettinato, The Pettinato Firm (Oct. 1, 2021), Ex. 1.

**II. States deny unregistered voters the right to vote.**

43. States have long used voter registration to draw the line between citizens they allow to vote and citizens they deny that right. *See*, *e.g.*, Ind. Code § 3-7-48-1

("a person whose name does not appear on the registration record may not vote");
Kan. Stat. § 25-2302; N.C. Gen. Stat. § 163-54 ("Only such persons as are legally
registered shall be entitled to vote . . . ."); S.C. Code § 7-5-110 ("No person shall be
allowed to vote at any election unless he shall be registered as herein required.");
Tex. Elec. Code § 11.002 ("'qualified voter' means a person who: . . . is a registered
voter."); Wis. Stat. § 6.15. If unregistered citizens show up at their polling place, a
state will not let them vote. If unregistered citizens request a mail-in ballot, a state
will not give them one. Voter registration draws the categories of voter eligibility.

44. Since the Civil War, states have used voter registration requirements to deny
citizens the right to vote. *See S. Carolina v. Katzenbach*, 383 U.S. 301, 311 (1966).
They used grandfather clauses (allowing registration only if the voter's grandfather
voted before enactment of the Thirteenth Amendment) and property requirements.
*Id.* Some states required registrants to interpret documents. *Id.* States leveraged
their election officials' discretion to discriminate against racial minorities when
deciding whether citizens met the voting qualifications. *Id.* at 312. Election officials
excused white registration applicants, gave them, "easy versions" of literacy tests,
or outright helped them. *Id.* Some states required "good morals," which presented a
standard "so vague and subjective that it ha[d] constituted an open invitation to
abuse at the hands of voting officials." *Id.* at 312-13. Most often, southern states did
not need to discriminate by stopping black voters at the polls because they already
stopped black people from registering to vote in the first place. *See* U.S. Comm'n on
Civil Rights, Political Participation 7 (1968) ("intimidation by violence became less

and less necessary to assure that the Negro would stay away from the polls and cease to run for office . . . ."), Ex. 2.

45. Many states still have registration requirements that the Fourteenth Amendment does not excuse. The Fourteenth Amendment discounts states' populations when they require qualifications beyond residence, citizenship, age eighteen years or greater, not convicted of crime, and not convicted of participating in rebellion. But the Arkansas Constitution denies registration to "idiot[s]," "insane person[s]," and soldiers stationed in Arkansas. Ark. Const., Art. 3, secs. 5, 7. California's statutes deny registration to people who pled not-guilty by reason of insanity and denies it to people "incompetent to stand trial." Cal. Elec. Code § 2211(a). Then-Representative James Garfield listed similar unjustifiable abridgments in 1870. *See* Ninth Census Report, H.R. Rep. No. 41-3 at 52-53 (Jan. 18, 1870).

46. Some states routinely require weeks of residency before registration. Pennsylvania denies the right to vote to people who move districts within thirty days before an election—even within the state if the citizen had not already registered to vote. 25 Pa. Cons. Stat. § 1301(a) (2021) (requiring residence "in this Commonwealth and the election district where the individual offers to vote for at least 30 days prior to the next ensuing election"). One Citizens member lived in Pennsylvania for three months before the November 2020 election, but Pennsylvania would not register her to vote because she moved too close to Election Day.

47. The Census has calculated, for each state, the number of citizens at least eighteen years old and the voter registration rates in each state. Table 4a, Reported Voting and Registration for States: November 2020, https://www2.census.gov/programs-surveys/cps/tables/p20/585/table04a.xlsx. The Sentencing Project estimated the number of citizens at least eighteen years old in each state who cannot vote because of a criminal conviction. *Locked Out 2020: Estimates of People Denied Voting Rights Due to a Felony Convictio*n (Oct. 30, 2020), Ayush Sharma Decl., Ex. 3, Ex. 5.

48. Calculating the bases for representation based on the Census' figures and the Sentencing Project's figures, and redistributing seats according to the method of equal proportions, the Fourteenth Amendment moves the following seats:

| State | Seat Adjustment | State | Seat Adjustment |
|---|---|---|---|
| California | -3 | New Jersey | 2 |
| Colorado | -1 | Arizona | 1 |
| Indiana | -1 | Maryland | 1 |
| New York | -1 | Mississippi | 1 |
| North Carolina | -1 | Ohio | 1 |
| South Carolina | -1 | Tennessee | 1 |
|  |  | Virginia | 1 |



U.S. House Seats the Fourteenth Amendment Moves Based on Voter Registration

49. Data Scientist Ayush Sharma completed the calculations that show precisely how these changes would move representative seats. Ayush Sharma Decl. ¶ 21, Ex. 7, Ex. 8. These calculations form part of the Amended Complaint "for all purposes." *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

## III. Wisconsin passed a law requiring photograph identification, and it abridges the rights to vote of 300,000 registered voters.

50. Voter denials and abridgments do not stop at registration. States abridge even registered voters' rights to vote. Some states do that by narrowing the list of documents by which voters can prove their identity. Some voter identification laws merely match a voter's signature with the signature on the voter's registration form. Others more simply require a voter to bring a utility bill or lease to the polls.

Yet others allow a voter merely to sign a declaration. But some states have recently passed strict photo voter ID laws that prohibit voters from voting unless they bring, with them to the polls, a particular photo ID. Those states list the particular photo ID documents that a voter can use. Some require very specific, unexpired photo IDs with current addresses.

51. Wisconsin may have the strictest photo voter ID law in the nation. It narrowed qualifying photo voter IDs so much that it disenfranchised "approximately 300,000 registered voters in Wisconsin, roughly 9% of all registered voters, [for lacking] a qualifying ID." *Frank v. Walker*, 17 F. Supp. 3d 837, 854 (E.D. Wis.), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014), *r'hrg en banc denied*, 773 F.3d 783, 785 (2014).

52. Citizens often do not possess the photo identification documents that states require. The Brennan Center for Justice at NYU Law School concluded that "[a]s many as 11 percent of United States citizens—more than 21 million individuals—do not have government-issued photo identification." Citizens Without Proof, Brennan Center for Justice, (Nov. 2006), https://www.brennancenter.org/sites/default/files/legacy/d/download_file_39242.pdf (cited approvingly by *Frank*, 773 F.3d at 785 (7th Cir. 2014) (Posner, J., dissenting from rehearing en banc)); *see also* Wendy R. Weiser, et al., *"Citizens Without Proof" Stands Strong*, Brennan Center for Justice (Sept. 8, 2011), https://www.brennancenter.org/our-work/research-reports/citizens-without-proof-stands-strong. Elderly, low-income, and minority citizens lack those IDs in even

higher percentages. Citizens Without Proof 3. And even if citizens possess photo IDs, ten percent of those IDs reflect outdated addresses or legal names. *Id.*

53. Even registered voters do not own photo identification. The Government Accountability Office reviewed ten studies and estimated that only 84 to 95 percent of voters possess a driver's license or state identification. *Issues Related to State Voter Identification Laws* ii, No. GAO-14-634 (Sept. 2014 rev. Feb. 2015).

54. If Census had calculated Wisconsin's basis of representation under the Fourteenth Amendment's equation by subtracting 300,000 citizens who could not vote because of Wisconsin's photo voter ID law (without calculating denials from voter registration rates), the Fourteenth Amendment would have moved one seat from Wisconsin to New York.

55. Data Scientist Ayush Sharma completed the calculations that show precisely how these changes would move representative seats. Sharma Decl. ¶ 23, Ex. 9, Ex. 10.

56. These results also accord with the results from a separate election data analytics firm. Election Data Services, *Final Census Apportionment Counts Surprises Many Observers; Raising Questions of Why?*, Table #1 (Apr. 28, 2021), electiondataservices.com/wpcontent/uploads/2021/04/NR_Appor20wTablesMaps-20210428.pdf, Sharma Decl., Ex. 12. That firm concluded that, if Wisconsin had 188,088 fewer citizens, it would have lost a representative seat. This analytical shortcut calculation confirms that, because the 300,000 proven in district court exceeds 188,088, Wisconsin would lose a seat because of its photo voter ID law.

Because New York would have received the next representative (number 436), it would receive the one Wisconsin lost. *See id.* at Table #1, page 2. This data demonstrates that because Wisconsin disenfranchised so many of its citizens, it would likely lose one representative seat, and New York would gain one.

57. If Census had calculated bases for representation for all states using both (a) denials from voter registration rates and (b) Wisconsin's voter abridgments because of its photo voter ID law, the Fourteenth Amendment would have moved a seat from Wisconsin to Pennsylvania (in addition to the other moves for registration rates).

58. Data Scientist Ayush Sharma completed the calculations that show precisely how these changes would move representative seats. Sharma Decl. ¶ 26, Ex. 13, Ex. 14.

## COUNT 1

59. Citizens hereby adopt by reference the previous paragraphs.

60. Census failed to implement its duties under the Fourteenth Amendment, Section 2, to discount states' basis of representation for distributing seats in the U.S. House of Representatives.

61. First, Census did not discount every state's basis of representation when those states denied their citizens' rights to vote by failing to include them on the list of registered voters. Census did not, then, reapportion seats according to the method of equal proportions.

62. Second, Census failed to discount Wisconsin's basis of representation based on Wisconsin abridging the right of its citizens to vote.

63. Congress assigned the Secretary of Commerce responsibility for "tabulat[ing]" the "total population by States . . . as required for the apportionment of Representatives in Congress among the several States," and required it to report to the President of the United States. 13 U.S.C. § 141.

64. Because Census did not implement the Fourteenth Amendment, it violated the APA by "entirely fail[ing] to consider an important aspect of the problem . . . ." *State Farm*, 463 U.S. at 43.

65. To the extent Census misinterpreted the Fourteenth Amendment not to require it to determine the denials or abridgments "in any way," it misconceived the law. That misconception violates the APA. *See NLRB v. Brown*, 380 U.S. 278, 292 (1965) ("Courts must, of course, set aside [agency] decisions which rest on an erroneous legal foundation.") (quotations omitted); *SEC v. Chenery Corp.*, 318 U.S. 80, 9 (1943) ("if the action is based upon a determination of law . . ., an order may not stand if the agency has misconceived the law.").

66. Census failed to complete the Fourteenth Amendment's analysis in issuing its report to the President, and because that report is incomplete, Census has acted arbitrarily and capriciously, otherwise contrary to law, and in contravention of Citizens' constitutional rights. It violated the APA and the Fourteenth Amendment.

## COUNT 2

67. Citizens hereby adopt by reference the previous paragraphs.

68. If the APA does not apply, this situation compels a writ of mandamus under the All Writs Act. Writs of mandamus issue "where the duty to be performed is

ministerial and the obligation to act peremptory, and plainly defined." *United States v. Wilbur*, 283 U.S. 414, 420 (1931). The Constitution compels a writ of mandamus to Secretary of Commerce Raimondo to complete the analysis of abridgments and to reissue the Report according to that analysis. *See Utah*, 536 U.S. at 459-62; *Franklin*, 505 U.S. at 802.

## PRAYER FOR RELIEF

69. Citizens request the following relief:

a. Declare Defendants violated the Fourteenth Amendment and the APA by failing to calculate each state's basis of representation when apportioning Representative seats.

b. Declare the current distribution of Representative seats, based on Secretary Raimondo's April 2021 Report to the President, void and illegal for lacking the analysis the Fourteenth Amendment required.

c. Vacate and set aside that Report and the President's 2 U.S.C. § 2a statement to Congress, and restore the 2010 apportionment.

d. Remand the Report to the Census Bureau, the Department of Commerce, Secretary Raimondo, and Acting Director Jarmin to complete the analysis the Fourteenth Amendment requires and to reissue the Report.

e. Enjoin the Census Bureau, the Department of Commerce, Secretary Raimondo, and Acting Director Jarmin to complete the analysis the Fourteenth Amendment requires, and to reissue the Report.

f. Issue a writ of mandamus directing the Census Bureau, the Department of Commerce, Secretary Raimondo, and Acting Director Jarmin to complete the analysis the Fourteenth Amendment requires and to reissue the Report.

g. Set a deadline for completing the new Report.

h. Reapportion one seat from Wisconsin to New York.

i. Reapportion seats according to Census's data of citizens and voter registration rates.

j. Award attorney fees and costs in favor of Citizens for Constitutional Integrity.

k. Issue any other and further relief as the Court concludes necessary or appropriate.

Dated March 21, 2022,

*/s/ Jared S. Pettinato*
JARED S. PETTINATO
The Pettinato Firm
3416 13th St. NW, #1
Washington, DC 20010
(406) 314-3247
Jared@JaredPettinato.com

Attorney for Plaintiff